# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

THE CHICAGO GUN CLUB, LLC, and )
TCGC PROPERTY, LLC, )
           )
            Plaintiffs, )
           )
             v. )         17 C 6057
           )
VILLAGE OF WILLOWBROOK, )
ILLINOIS, )
           )
            Defendant. )

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendant Village of Willowbrook's ("Village") Motion to Dismiss ("Motion") Plaintiffs The Chicago Gun Club, LLC and TCGC Property, LLC's (collectively, "Plaintiffs") Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the following reasons, the Court grants the Village's Motion.

## BACKGROUND

The following facts are taken from Plaintiffs' Complaint. Well-pled facts are assumed to be true for purposes of this Motion. *Murphy v. Walker,* 51 F.3d 714, 717 (7th Cir. 1995). The Court draws all reasonable inferences in Plaintiffs' favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

The central parties are as follows. Co-plaintiff The Chicago Gun Club, LLC ("Club") is an Illinois organization that holds an option to purchase a parcel of

property ("Subject Property") within the municipal limits of the Village. Co-plaintiff TCGC Property, LLC ("TCGC") owns the Subject Property. The defendant Village, a town of approximately 8,540 people per the 2010 census, is a municipal entity in Illinois governed at all relevant times by Mayor Frank A. Trilla ("Mayor Trilla") and a six-member Board of Trustees ("Board"). The Willowbrook Plan Commission ("Plan Commission") is a seven-member body that advises the Board on matters relevant to the instant case, such as zoning. The Plan Commission also possesses final authority on zoning grievances.

The Subject Property, located at the northeast corner of the Village's 79th Street and Frontage Road intersection, is approximately 3.42 acres in area and classified in the B-3 General Business Zoning District. It is presently surrounded by lots classified in the B-4 Highway and Service Business Zoning District, including three properties – all hotel/motels – identified in the Complaint as immediately abutting the Subject Property or lying across the street.

Frontage Road runs in a north-south direction and borders the entire west side of the Subject Property. To the immediate west of Frontage Road, running parallel in a north-south direction, is Route 83, a six-lane highway. To the west of Route 83 is a residential area of single-family homes in an R-2 Single Family Residence District. Measured lot line to lot line, the residential area is located beyond both Frontage Road and Route 83, over 260 feet from the Subject Property.

On or about January 6, 2017, and at a cost of $18,009.50, Plaintiffs filed an application with the Village for a "special use permit" to construct, develop, and operate a "Firing Range, Indoor" on the Subject Property ("Application"). The Application also requested the Village to rezone the Subject Property from a B-3 classification to a B-4. If developed as proposed, the Subject Property would have housed a 31,000-square-foot indoor shooting facility, to have included thirty-two shooting lanes alongside training/educational classrooms, members' lounges, retail, vehicle retail, and offices. The remainder of the Subject Property would have consisted of approximately 129 off-street parking spaces and two large water detention areas. As of the filing of the Complaint on August 18, 2017, the facility would have been the Village's only indoor shooting range.

On March 5, 2014, almost three years before the Application was filed, the Senior Planner for the Village identified the Subject Property as "potentially consistent with, or eligible for, a B-4 zoning for the specific use of an indoor shooting range." As of March 24, 2014, the B-4 classification has provided that firearms stores, so long as they do not adjoin I-55 or Route 83, are permitted "as a matter of right." Additionally, "Firing range, indoor" is a "special use," requiring a special use permit issued under Willowbrook Ordinance 9-6D-2. Plaintiffs allege, in conclusory fashion, that the Subject Property is the "only property with any practical chance of development with an indoor shooting facility," as no other "existing B-4 zoned

properties within [the Village] are suitable for a modern indoor shooting range consistent with the [Village's] parking requirements."

On April 13, 2016, the Club informally presented its development concept to the Plan Commission, which recommended that the Club "proceed with a submittal for Rezoning, Special Use Permit, and Site Plan Review." Over a seven-month span, from June 1, 2016 through January 5, 2017, Plaintiffs incurred approximately $74,818.81 in direct application-related expenses to comply with Village processes. On October 4, 2016, in the middle of the seven-month period, Plaintiffs entered into a Real Estate Purchase Option Agreement ("Option Agreement"), whereby the Club reserved the right to purchase the Subject Property from TCGC.

After filing their Application on or about January 6, 2017, and through April 24, 2017, Plaintiffs incurred an additional $16,131.20 in engineering, architectural, survey, landscape, and other costs directly related to the Village's review and comment process. Per the Village's requisite Traffic Impact Study, a civil engineering firm determined that the proposed development of the Subject Property would not result in significant delays or require changes to the existing traffic-related infrastructure. During this period, the Plan Commission held two public hearings, one each on February 22 and April 5, to receive evidence and testimony. On April 5, 2017, the Plan Commission, with five affirmative votes, no negative votes, and one abstention, recommended that the Application be granted. The Plan Commission

forwarded its recommendation and Findings of Fact to Mayor Trilla and the Board on or about April 10, 2017.

On April 24, 2017, the Board held a public meeting on Plaintiffs' Application ("April 24 meeting"). Plaintiffs allege that during the meeting, and in contravention of numerous Village ordinances, their representatives were heckled, the Village failed to discourage or limit redundant comments, and no time limits were imposed. The meeting was continued and resumed on May 22, 2017 ("May 22 meeting"), where it is alleged that multiple public speakers who offered comment at the April 24 meeting were allowed a second opportunity to speak, again in contravention of a Village ordinance. Plaintiffs allege that these deviations from Village rules "unfairly prejudice[d] the [Board] in its consideration of Plaintiffs' Application."

At the conclusion of the additional public comment period, certain Board members asked security-related questions of Plaintiffs, such as whether they would consider adding a fence around the Subject Property, to which Plaintiffs responded affirmatively. Plaintiffs state that at neither the April 24 meeting nor the May 22 meeting did any Village Trustee make a statement that signaled disagreement with the Plan Commission's Findings of Fact.

On May 22, 2017, the Board denied Plaintiffs' Application by a vote of four to two. On June 12, 2017, the Board ratified the minutes of the May 22 meeting without any motion from a Village Trustee for reconsideration of the Application's denial. On June 13, 2017, Willowbrook's Village Administrator sent the Club a letter indicating

that the Application had been denied.  Plaintiffs state that they have exhausted their administrative and local remedies.

As a result of their Application's denial, Plaintiffs allege that they have been prevented from developing the Subject Property and that the Club has lost its primary and essential source of investor funds to timely execute on the Option Agreement. Plaintiffs also allege that the denial has deprived them of the "highest and best use of their property" and "destroy[ed] the value of their property."  Finally, Plaintiffs insist that, if they are not permitted to develop the Subject Property in accordance with their proposed indoor shooting range, "they will continue to suffer a substantial loss in the value of their property without any compensating gain to the public or governmental purpose."

Plaintiffs filed their instant Complaint on August 18, 2017.  It states five discrete causes of action as well as an addendum of sorts, which requests relief "for all counts."  Plaintiffs' first three counts are all brought under 42 U.S.C. § 1983.  Count I raises a Second Amendment challenge to the denial of the Application, claiming that it "effectively banned the operation of gun ranges, thereby prohibiting numerous traditional lawful uses of firearms."  Count II is a First Amendment action and alleges that "[b]y banning gun ranges open to the public," the Village deprived Plaintiffs "of their right to free speech."  Count III is brought by TCGC in its individual capacity and asserts a Fifth Amendment regulatory takings claim.  Count IV, brought pursuant to §§ 1983 and 1981(a), alleges that the Village deprived Plaintiffs "of their right to

open and operate gun ranges, unconstitutionally den[ying] Plaintiffs equal protection of the law" in violation of the Fourteenth Amendment's Equal Protection Clause. Count V sets forth an Illinois state law claim and requests the Court to review, *de novo*, the Village's actions under 65 ILCS 5/11-13-25. Finally, "for all counts," "Plaintiffs seek a declaration that the Village's denial of Plaintiffs' [Application]…is unconstitutional."

## LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) "tests the sufficiency of the complaint, not the merits of the case." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012). The allegations in the Complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiffs need not provide detailed factual allegations, but they must provide enough factual support to raise their right to relief above a speculative level. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "In conducting our review, we must consider not only the complaint itself, but also…documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Phillips v. Prudential Ins. Co. of America*, 714 F.3d 1017, 1019—20 (7th Cir. 2013) (internal citations and quotation marks omitted).

A claim must be facially plausible, meaning that the pleadings must "allow…the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The claim must be described "in sufficient detail to give the defendant 'fair notice of what the…claim is and the grounds upon which it rests.'" *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678.

## DISCUSSION

## I.    Count I: Second Amendment Claim

It is Plaintiffs' contention that the rejection of their Application for a special use permit and a rezoning of the Subject Property to B-4 – the combination of which would have allowed for the construction and operation of an indoor gun range and gun store –effectively imposed an outright ban on gun ranges and gun sales in the Village of Willowbrook. The Complaint lacks allegations of fact in support of its sweeping "outright ban" generalization. Plaintiffs' broad posture is contradicted by judicially noticed exhibits demonstrative of both sizable areas in the Village zoned B-4 as well as a permissible special use of "indoor firing range" in B-4 districts. With this in mind, we turn to the legal terrain of the instant dispute.

Seven years ago, a collection of plaintiffs challenged a City of Chicago ("City") ordinance that "mandate[d] one hour of range training as a prerequisite to lawful gun ownership…yet at the same time prohibit[ed] all firing ranges in the

city….” *Ezell v. City of Chi.*, 651 F.3d 684, 689—90 (7th Cir. 2011) (“*Ezell I*”). Before striking down the ordinance, the Seventh Circuit addressed the threshold question of whether the gun range ban, like the handgun bans of *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), warranted examination under “an appropriate standard of review from among the heightened standards of scrutiny the Court applies to governmental actions alleged to infringe enumerated constitutional rights….” *Id*. at 703. Because “[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use,” the court held that the statutory gun range ban severely impinged the plaintiffs’ Second Amendment rights. *Id*. at 704, 706. Therefore, “the City b[ore] the burden of justifying its actions under *some* heightened standard of judicial review,” which it ultimately failed to do. *Id*. at 706, 711.

After having its citywide ban enjoined in *Ezell I*, the City’s Second Amendment bona fides were challenged again last year, this time over the regulations that it imposed to replace the ordinance invalidated in 2011. In “*Ezell II*,” the Seventh Circuit was presented with a pair of municipal regulations – a manufacturing-district classification and a distancing restriction – the combined effect of which left “only about 2.2% of the city’s total acreage even theoretically available to site a shooting range.” *Ezell v. City of Chi.*, 846 F.3d 888, 894 (7th Cir. 2017). Although the regulations were “not on their face an outright prohibition of gun ranges,” the court found that they “nonetheless severely restrict[ed] the right of Chicagoans to train in

firearm use at a range." *Id.* Reiterating *Ezell I*'s holding – that range training "lies close to the core of the individual right of armed defense" – the Seventh Circuit applied a heightened standard to the City's new restrictions on the Second Amendment, requiring "the City to establish a close fit between the challenged zoning regulations and the actual public benefits they serve." *Id.* at 893, 894. Mimicking its struggles in *Ezell I*, the City's ordinances were again unable to survive heightened scrutiny. *Id.* at 896.

It is under this evolving branch of constitutional law that Plaintiffs raise their instant Second Amendment cause of action. Count I's stated § 1983 violation alleges that the Village's denial of Plaintiffs' Application and the Board's attendant declination to rezone the Subject Property "effectively banned the operation of gun ranges, thereby prohibiting numerous traditional lawful uses of firearms." Plaintiffs ask the Court to examine the Village's actions under the heightened scrutiny of *Ezell I* and *II*, which, to be sure, contemporary right-to-bear-arms jurisprudence essentially requires whenever a municipal zoning scheme outright or effectively bans firing ranges. *See Ill. Ass'n of Firearms Retailers v. City of Chi.*, 961 F.Supp.2d 928, 936 (N.D. Ill. 2014) ("The more people [the ordinance] affects or the heavier the burden on the core [Second Amendment] right, the stricter the scrutiny").

Whereas the distinct *Ezell* challenges contemplated just that – an outright ban in the first case and a regulatory scheme that functionally banned firing ranges in the second – here Plaintiffs argue that "[the Village's] alleged permission of gun ranges is

illusory if, by using zoning and special use permit processes to disallow constitutionally-protected yet disapproved activity, there is no real way to open a gun range in the Village." But it is only in their opposition brief that Plaintiffs lodge the occasional wayward jab at Willowbrook's legal zoning processes. The Complaint itself raises no objection to Willowbrook's statutory zoning scheme on its face.

Plaintiffs allege neither that the Village has flat-out banned gun ranges nor that a regulatory structure exists to effectuate such a ban. There are no allegations as to a prohibitively limited supply of B-4 properties within Village limits. To the contrary, and as demonstrated by the Village of Willowbrook Zoning Map ("Zoning Map"),[1] the town of less than 9,000 people possesses well over a dozen such properties. Plaintiffs also routinely acknowledge that the Village has in place explicit "special use" zoning regulations that permit indoor gun ranges on B-4 properties. See Willowbrook, Ill., Code title 9-6D-2 (2017).

Instead, by its own terms, Count I challenges "Willowbrook's actions," an unambiguous reference to the Village's exercise of its vested discretion to reject a private entity's entreaty to rezone property. Apart from two vague references to "associated laws" in Counts I and IV,[2] the Complaint concerns itself exclusively and narrowly with specific decisions made by the Village in an isolated circumstance. Nonetheless, Plaintiffs maintain that the Second Amendment interest implicated by

---

[1] Both the Village and Plaintiffs attached copies of the Zoning Map to their 12(b)(6) memoranda. We take judicial notice of the map, as it is "not subject to reasonable dispute because it…can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b)(2).

[2] "'[N]aked assertions' devoid of 'further factual enhancement'" are insufficient to state a claim at the 12(b)(6) stage. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

the Village's declination to rezone the Subject Property presents "no legal difference" from that of the factual predicates in the *Ezell* cases. Plaintiffs posit that this lack of a cognizable legal distinction should subject the Village's actions to the "near-strict scrutiny" utilized in *Ezell II*.

Plaintiffs overstate the certainty of such a postulate. The factual underpinnings of both *Ezell* cases contemplated broad, citywide regulations that actively circumscribed the Second Amendment rights of millions of Chicagoans. Here, nothing in the Complaint even remotely suggests that the 8,000-plus inhabitants of Willowbrook live under a municipal zoning scheme that restricts their access to firing ranges. Rather, Plaintiffs allege that the Village's one-time refusal to rezone a property at the behest of a pair of private actors is, in and of itself, a violation of the Second Amendment. Boiled down to its essence, the legal proposition necessary to sustain such a claim is this: any zoning decision or non-decision, even one inarguably within the elective ambit of the municipal body vested with lawful zoning authority, that discretely and immediately results in a township devoid of a gun range, automatically triggers heightened scrutiny. While Plaintiffs decline to state this notion overtly, their opposition memorandum functionally adopts it, wherein they request heightened scrutiny because "[t]he denial of Plaintiffs' Application amounts to a municipal ban."

This proposition is untenable. Plaintiffs' objection to the Village's zoning decision does not amount to a "law challenged on Second Amendment grounds,"

*Ezell II*, 846 F.3d at 893, but rather states a challenge to a single exercise of the "undoubtedly broad" zoning authority vested in local governments. *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68 (1981). Certainly, "the zoning power is not infinite and unchallengeable [and] 'must be exercised within constitutional limits….'" *Id.* (quoting *Moore v. E. Cleveland*, 431 U.S. 494, 514 (1977) (Stevens, J., concurring)). What we have here, however, is not some flagrant zoning law resolved to violate the Second Amendment. This is merely an isolated zoning decision to maintain the status quo, reached within a regulatory scheme that carves out unequivocal permission for gun range development in numerous existing lots across town. So noncontroversial an act cannot possibly invoke the specter of heightened scrutiny without depriving the test of its purpose, which is to counterbalance a severe burden levied against the citizenry's fundamental rights. *See Ezell II*, 846 F.3d at 892 ("Severe burdens on the core right of armed defense require a very strong public-interest justification and a close means-end fit; lesser burdens, and burdens on activity lying closer to the margins of the right, are more easily justified"). Because we find that the Village's actions not only did not, but could not possibly have imposed as significant a burden on the Second Amendment as the wholesale bans at issue in *Ezell I* and *II*, we reject Plaintiffs' request to subject them to heightened scrutiny.

Therefore, having decided that the Village is not required to provide "a very strong public-interest justification and a close means-end fit," *id.*, we proceed under the dictates of *Heller*, which tell us that the "conditions and qualifications on the

13

commercial sale of arms" are "presumptively lawful." 554 U.S. at 626—27, 627 n.26.

In the firearm-sale context, a fellow Northern District court recently crafted the

following "presumptively-valid test" for the pleadings stage:

> The presumption afforded to such restrictions, at a minimum, puts the
> initial burden on the plaintiff to establish that the restriction on the sale
> of firearms violates the Second Amendment. At the pleadings stage,
> plaintiffs accomplish this by articulating specific facts to create a
> plausible inference that the restrictions on the sale of firearms abridge
> the individual right to possess firearms for protection.

*Second Amendment Arms v. City of Chi.*, 165 F.Supp.3d 743, 753 (N.D. Ill. 2015).

The Court finds *Second Amendment Arms* persuasive and adopts its rationale here.

Unless Plaintiffs' allegations permit the Court to reasonably infer that the Village's

actions abridge the right to train in firearm proficiency, Count I must be dismissed.

For the following two reasons, Plaintiffs' allegations fail to raise such an inference:

(1) the analogous burden in the First Amendment context has already been

resoundingly rejected as a ground for a free speech violation; and (2) geographical

considerations debunk any practical assertion that the implicated right has been even

moderately burdened.

### 1. First Amendment Analogue

Urged by the City in *Ezell I* "to import the 'undue burden' test from the Court's

abortion cases," the Seventh Circuit instead relied on the profusion of federal free

speech jurisprudence to craft a standard of review for the challenged gun range ban.

651 F.3d at 706. The court noted that "[b]oth *Heller* and *McDonald* suggest that First

Amendment analogues are more appropriate…and on the strength of that suggestion, [the Seventh Circuit] and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context." *Id*. at 706—07 (internal citations and quotation marks omitted).

Following suit, both parties cite to *City of Renton v. Playtime Theatres, Inc.*, a seminal First Amendment case that examined a zoning ordinance that "prohibited any adult motion picture theater from locating within 1,000 feet" of a myriad of properties. 475 U.S. 41, 44 (1986) (internal quotation marks omitted). The *Renton* respondents argued that "some of the land in question [was] already occupied by existing businesses, that practically none of the undeveloped land [was] currently for sale or lease, and that in general there [were] no commercially viable adult theatre sites" left available by the zoning ordinance. *Id*. at 53 (internal quotation marks omitted). For this very reason, the Ninth Circuit initially struck down the ordinance as a "substantial restriction on speech." *Id*. at 54 (internal quotation marks omitted).

The Supreme Court rejected this legal notion wholesale, issuing an emphatic rebuff:

> That respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation. And although we have cautioned against the enactment of zoning regulations that have the effect of suppressing, or greatly restricting access to, lawful speech, we have never suggested that the First Amendment compels the Government to ensure that adult theaters, or any kinds of speech-related businesses for that matter, will be able to obtain sites at bargain prices…. In our view, the First Amendment requires only that Renton refrain from

effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city….

*Id*. (internal citations and quotation marks omitted).  The Court found that the zoning regulation at issue "easily [met] this requirement," the City of Renton "ha[d] not used the power to zone as a pretext for suppressing expression," and the ordinance was constitutional thereby.  *Id*. (internal quotation marks omitted).

In their opposition brief, Plaintiffs identify eleven businesses that presently occupy B-4 properties within Willowbrook, lamenting that "there is no vacant property zoned B-4 in the Village."  Plaintiffs argue that their "vacant, B-3 zoned property…is ideal for a gun range, and the Complaint alleges the Defendant knows it."  But *Renton* makes explicit that municipalities do not have to cure a private party's distaste for the prevailing whims of the free market.  That the Village is aware that there are no B-4 lots readily available for purchase or development does not, per *Renton*'s express teachings in the First Amendment context, require the Village to marshal its zoning power to bend the real estate market to Plaintiffs' business aims, even where those aims contemplate rights guaranteed under the Constitution.  As long as the zoning scheme itself does not deny Plaintiffs a "reasonable opportunity to open and operate" their business, the Village's lawful actions within said scheme do not run afoul of the Constitution.  *Renton*, 475 U.S. at 54.

As we have already discussed, Plaintiffs' Complaint assiduously details a zoning scheme that not only offers a reasonable opportunity for the development of

gun ranges, but one that articulates definitive authority for their construction as-of-right. *See supra* pp. 12—13. Plaintiffs do not allege that they are restricted from pursuing gun range opportunities should a viable B-4 property hit the market. They merely repine at the present-day dearth of available B-4 real estate and the Village's unwillingness to accommodate their misfortune, which, adopting *Renton* for Second Amendment purposes, does not deprive Plaintiffs of, in their words, the "right to open and operate gun ranges."

## 2. Geographical Considerations

In *Ezell I*, the Seventh Circuit noted that the citywide ban at issue was "not [an] application-specific harm[] calling for individual remedies." 651 F.3d at 698. Rather, the plaintiffs brought a facial challenge to the ordinance itself, such that "the claimed constitutional violation inheres in the terms of the statute itself, not its application." *Id*. "Chicago's law," the court continued, "if unconstitutional, is unconstitutional *without regard* to its application…." *Id*. *Ezell II*, however, asked the court to "review[] a set of zoning restrictions, not an outright ban...." 846 F.3d at 893. This difference required the Seventh Circuit to determine the as-applied, practical burden that the restrictions placed on Chicagoans' Second Amendment rights, rather than surmise an inherent constitutional violation in the ordinances themselves. *See id.* at 894.

Here, Plaintiffs' objection to the Village's actions recalls the as-applied challenge of *Ezell II* as opposed to the facial attack of *Ezell I*. Moreover, having noted

that the "conditions and qualifications on the commercial sale of arms" are "presumptively lawful," it stands to reason that a discrete action to abide by an existing zoning scheme that regulates gun range development would not violate the Constitution on its face. *Heller*, 554 U.S. at 626—27, 627 n.26. Once more, the court in *Second Amendment Arms* offered a succinct summary of the upshot of a contextual, as-applied consideration:

> While preventing a firearms retailer from setting up shop at a marquee Michigan Avenue location might impact walk-up sales and impulse buys, for those intent on purchasing a firearm (which is what the Second Amendment is concerned with), a slight diversion off the beaten path is no affront to their Second Amendment rights.

135 F.Supp.3d at 754.

As did that of *Renton*, the logic of *Second Amendment Arms* fits snugly within the contours of the instant case. Per the Complaint, as of 2010, Willowbrook was a rather small town, sized at 2.75 square miles and made up of less than 9,000 people. Defendants highlight two gun ranges in DuPage County, in which Willowbrook sits, immediately accessible to Village residents: Article II Range sits to the north in Lombard, Illinois, just under fourteen miles from the Village[3]; to the southwest is Bolingbrook's The Range at 355, less than nine miles away and located just off I-55, the major expressway servicing the southwest suburbs. To Willowbrook's east sits

---

[3] The Court utilized Google Aerial Maps to calculate the distance between each gun range and the intersection of Madison St. and Ridgemoor Dr. in Willowbrook, a rough approximation of the obtusely shaped Village's geographical center. Such distances are properly considered in a 12(b)(6) ruling, as they are the sort of "information that is subject to proper judicial notice." *Phillips*, 714 F.3d at 1020 (7th Cir. 2013). *See Cellco P'ship v. City of Peoria*, No. 16-1337, 2017 WL 2125669, at *7 (taking judicial notice of a Google Aerial Map because "[t]he distance between two buildings is a fact that 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned'") (quoting Fed. R. Evid. 201(b)(2)).

another pair of gun ranges even closer than the two just mentioned: Midwest Guns & Pistol Range lies just seven miles from the Village, in Lyons; Shoot Point Blank, in Hodgkins, is hardly five miles away.

This goes to the heart of Plaintiffs' assertions based on derivative standing,[4] that the Village's actions "inhibit[] the public's right to keep and bear arms." Here, the Second Amendment right of the public to train in firearm proficiency – particularly as concerns any residents of Willowbrook or neighboring towns who would be intent on training at the Club – has already been abundantly accommodated by nearby facilities. Plaintiffs' potential customers have a surplus of close and accessible gun ranges. The Village's refrainment from rezoning a single lot to add another range imposes no burden on the public's ability to utilize any of the plethora of existing, like facilities. Because a slight deviation from an individual's road to exercising her Second Amendment rights does not offend her rights, Plaintiffs' associational argument is unavailing.

*     *     *

The allegations before the Court do not trigger the heightened scrutiny espoused in *Ezell I* and *II*, the analogous right to free speech has already been held unburdened when confronted with a similarly stubborn free market, and the practical burden that the Village's decisions levied on the public's Second Amendment rights

---

[4] "[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Craig v. Boren*, 429 U.S. 190, 195 (1976).

was *de minimis*, if even that.  Because Plaintiffs have failed to plead facts that allow the Court to infer that the Village's actions may have violated the Second Amendment, Count I is dismissed.

## II.    Count II: First Amendment Claim

The Complaint alleges that the Village's actions have deprived Plaintiffs and the public of their First Amendment "right to provide and receive education and instruction in the use of firearms, including the right to provide and receive the training desired by, and beneficial to, the public as a corollary to owning firearms." As discussed above, however, *Renton* holds that a zoning ordinance only violates the First Amendment where it "effectively den[ies] respondents a reasonable opportunity to open and operate" the disseminator of their choice.  475 U.S. at 54.  The Village's zoning scheme does no such thing, and its lawful decision under that scheme to refrain from expanding the real estate market to accommodate Plaintiffs does not, under *Renton*, implicate Plaintiffs' or the public's free speech rights.  It is the free market that has inconvenienced Plaintiffs' expressive desires, not the Village of Willowbrook, and the free market is not a party to this case.  Count II is dismissed.

## III.    Count III: Fifth Amendment Regulatory Takings Claim

Count III asserts a regulatory takings claim, which the Village argues should be dismissed as unripe. Per *Williamson County Regional Planning Commission v. Hamilton Bank*, "if a State provides an adequate procedure for seeking just

compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." 473 U.S. 172, 195 (1985). In *Flying J. Inc. v. City of New Haven*, the Seventh Circuit localized the Supreme Court's exhaustion requirement to the very circumstance at issue here, holding that "[e]ven in cases where a developer's proposed use is clearly at odds with local zoning ordinances, the developer must first seek a variance in the local zoning laws *and then pursue whatever state court remedies are available before filing a takings claim in federal court*." 549 F.3d 538, 543 (7th Cir. 2008) (emphasis added).

Plaintiffs essentially concede that there is a state court remedy available by pleading Count V, an "Illinois state law claim" seeking "review of violation of compliance with zoning standards." Additionally, Illinois courts have long entertained inverse condemnation claims, in which a "property owner seeks compensation for a taking of private property where a condemnation proceeding has not been instituted." *City of Chi. v. ProLogis*, 236 Ill.2d 69, 77 (2010). *See, e.g.*, *Lamar Whiteco Outdoor Corp. v. City of West Chi.*, 355 Ill.App.3d 352 (2d Dist. 2005); *Van Duyne v. City of Crest Hill*, 136 Ill.App.3d 920 (3d Dist. 1985).

The Complaint does not allege that Plaintiffs have sought these remedies in state court. Plaintiffs' response brief states only that they "brought suit after the Defendant declined to reconsider its final denial." Under *Williamson* and *Flying J.*, that is not enough to satisfy the remedy exhaustion requirement in federal takings situations. Count III is dismissed for failure to exhaust remedies.

**IV.    Count IV: Fourteenth Amendment Equal Protection Claim**

The Seventh Circuit "has read *Williamson* broadly, rejecting attempts to label 'takings' claims as 'equal protection' claims and thus requiring 'ripeness.'" *Forseth v. Vill. of Sussex*, 199 F.3d 363, 370 (7th Cir. 2000).  "However…*bona fide* equal protection claims arising from land-use decisions can be made independently from a takings claim and without being subject to *Williamson* ripeness."  *Id.*

Not only do Plaintiffs' pleadings fail to demonstrate such independence, they decline to even feign dissimilarity.  Paragraph seventy-seven of Count IV's Equal Protection claim requests the following relief:

> Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983.  Plaintiffs are therefore entitled to declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendant's unconstitutional customs, policies, and practices, as well as for their financial losses for the irretrievably damaged (and soon to void due to expiration) purchase option value, as well as for Club's lost business opportunities, expended business costs and expenses, and lost profits.

Paragraph seventy-two of Count III's takings claim requests the *identical* relief.  The only two differences are an additional nine words in the takings claim that highlight "monetary damages for the value of TCGC's Subject Property" and the lone insertion of the word "Club" into Count IV's request for relief.  Moreover, the unconstitutional "customs, policies, and practices" that Plaintiffs highlight in Count IV are a blatant recast of the allegation in Count III that the Village's actions amounted to a regulatory taking of the Subject Property.

Plaintiffs' equal protection claim rests firmly upon the regulatory taking alleged in Count III. An equal protection claim "based on the same facts as a takings claim" cannot skirt *Williamson*'s exhaustion requirement. *Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934, 961 (7th Cir. 2004), *abrogated on other grounds by Kolton v. Frerichs*, 869 F.3d 532 (7th Cir. 2017). Because we have already determined that Plaintiffs failed to exhaust their state remedies in the takings arena, and "the *Williamson County* exhaustion requirement applies with full force" to takings claims refashioned as equal protection claims, we dismiss Count IV for failure to exhaust remedies. *Greenfield Mills*, 361 F.3d at 961.

## V.  Count V: Illinois State Law Zoning Claim

Count V is a state law claim, only before the Court by way of supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). District courts possess "the discretion to decline jurisdiction where all federal claims have been dismissed." *Thurman v. Vill. of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006). We invoke our 28 U.S.C. § 1367(c)(3) discretion now and dismiss Count V accordingly.

## VI.  Request for Declaratory Judgment "For All Counts"

Count VI seeks declaratory judgment "for all counts." All claims having been dismissed, there is no count remaining upon which to grant declaratory judgment, and Count VI is dismissed accordingly.

## CONCLUSION

The Complaint alleges that "[t]he refusal of the Village's Board of Trustees to approve the Plaintiffs' Application for a special-use permit for a luxury indoor shooting range on the Subject Property was arbitrary, capricious, and unreasonable, and was based purely on an unconstitutional motive: a perceived anti-gun, anti-Second Amendment bias of certain residents of the Village of Willowbrook and the surrounding communities."  Notwithstanding the general acceptance of adequately alleged facts as true for purposes of assessing the merits of motions to dismiss, this portion of Plaintiffs' pleadings occupies the realm of argument and conclusion rather than well-pled fact.  Based on the necessity of continuing the April 24 and May 22 public hearings to afford to speakers the length of time essential to express their views, it is apparent that many Village citizens were not only interested in Plaintiffs' proposal, but opposed it.

The Second Amendment to the Constitution of the United States affords protection to the right of the people to keep and bear arms from actions by the government of that very nation and, through the adoptive process, by governmental units of the union's many states.  It is but one of many amendments designed to safeguard various freedoms from government oppression.

In its Preamble, the purpose of the Constitution is set forth with these words, among others:

> …in Order to form a more perfect Union, establish Justice, insure domestic Tranquility, provide for the common defence, promote the general Welfare, and secure the Blessings of Liberty….

U.S. Const. pmbl.  The Second Amendment was never intended to be a battering ram, used to push aside the beliefs and concerns of American citizens.  The idea that a gun range and gun store located in the middle of a small village is incompatible with concepts of a more perfect Union or the enjoyment of domestic Tranquility – an idea espoused in a public forum by its residents – is entitled to credence.  There is nothing about such a view to render it arbitrary, unreasonable, or capricious.  The Constitution rightfully honors freedom of expression, and opposition, by those affected by government action.  Condemnation of such speech is not to be admired.

*     *     *

For the aforementioned reasons, the Court grants the Village's Motion and dismisses the Complaint.  It is so ordered.

Dated: 6/6/2018

_Charles P. Kocoras_
_____

Charles P. Kocoras
United States District Judge